UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BASF CORPORATION

v.

MAN DIESEL & TURBO NORTH
AMERICA, INC.

CIVIL ACTION

NO. 13-42-JWD-RLB

RULING AND ORDER

This matter comes before the Court on the Reurged Motion for Summary Judgment (Doc. 78) filed by Man Diesel & Turbo North America, Inc. ("MAN") and the Cross-Motion for Summary Judgment (Doc. 86) filed by BASF Corporation ("BASF"). Each motion is opposed. Oral argument was heard on the motions on April 20, 2015.

MAN argues in its motion that its November 7, 2011, quote (the "Quote") governs the parties' relationship and that, consequently, BASF cannot recover consequential damages. BASF argues that MAN's Quote is not an offer, that BASF's December 28, 2011, Purchase Order (the "Purchase Order" or "P.O.") controls the parties' relationship, and that, as a result, BASF can recover both its expenses and its lost profits. MAN responds that the Purchase Order was sent after performance began, and BASF claims that the Purchase Order was sent before performance commenced.

MAN's motion is easily denied. Reasonable jurors could easily conclude that MAN's Quote was not an offer, so summary judgment is inappropriate. Further, even if the Quote were an offer, reasonable minds could conclude that MAN's Quote was not expressly accepted or accepted by silence. These are additional reasons for denying MAN's motion.

BASF's motion is much closer. As with MAN's motion, the first critical question to BASF's motion is whether MAN's Quote is an offer. If the Quote is not an offer, then BASF's

motion for summary judgment should be granted; the parties clearly had a contract (either under the Purchase Order or orally), so lost profits would be recoverable under the Purchase Order or under La. Civ. Code art. 1995. Because the Court finds that MAN has presented enough evidence – barely – to show that there is an issue of fact as to whether the Quote is an offer, and because BASF conceded at oral argument that there is a question of fact as to this issue, the Court finds that a reasonable juror could conclude that MAN's Quote was an offer.

Assuming that the Quote is an offer (which the Court must do when construing the evidence in a light most favorable to MAN), there are other issues of material fact that make summary judgment for BASF inappropriate. First, there is a question of fact as to when performance began. If performance began before the Purchase Order was sent, then the Purchase Order was a request for a modification of the existing contract. If the Purchase Order is a request for modification, then there is an issue of fact as to whether that request was accepted. Thus, because the Court must construe the evidence in a light most favorable to MAN, the Court finds that, for purposes of BASF's motion, a reasonable juror could conclude that the Quote was an offer, that performance began before the Purchase Order was sent, that the Purchase Order was consequently a request for a modification of a preexisting contract based on the Quote, that the request for modification was not accepted, and that the Quote's clause prohibiting the recovery of consequential damages governs. In short, BASF's motion for summary judgment should be denied.

Additionally, BASF's motion for summary judgment should be denied because the Fifth Circuit has held that summary judgment is inappropriate in cases such as this where there is undoubtedly a contract between the parties but there are questions of fact as to what terms govern that contract. This suit is squarely in line with those cases.

In short, there are simply too many issues of material fact to justify summary judgment in favor of either party. Accordingly, both motions are denied.

## I. <u>Relevant Factual Background</u>

### A. *The C-300 Compressor Leak and the November 7, 2011, Quote*

BASF owns and operates a chemical manufacturing facility in Geismar, Louisiana. (Petition for Damages, Doc. 1-4, p. 4). In October 2011, MAN overhauled the C-300 Compressor and another machine at the Ethylene Oxide Unit at BASF's Geismar facility. (Affidavit of Nicholas Granier, Doc. 78-8, p.1). At that time, the Original Equipment Manufacturer (i.e., Siemens) decided not to have the seals replaced on the C-300 Compressor, presumably to avoid shutting down the machine and losing productivity. (*Id*., p. 2).

In response to a verbal request from BASF, MAN generated the Quote for the seal replacement on November 7, 2011. (Granier Affidavit, Doc. 78-8, p. 2). The November 7, 2011, Quote # 11-11382[1] states in the regarding line:

> Equipment: Compressor (EO) change seals
> Start Date: November 9, 2011
> Duration: 2Days

(*Id*.). The Quote also provides as the first item under "Work Scope: Safety & Setup" - "Receive Permits and walk tag out with the client representatives and indoctrinate all employees." (Docs. 78-4 & 86-12, p. 1). The Quote then sets forth the remaining items of work that need to be performed and lists the cost of the work as $26,750.00. (*Id*.). The Quote also states that MAN is to provide, "Tooling required to perform scope finalized by client and MAN." (*Id*.). On the second page, the Quote provides that the tentative start date for the job is November 9; however,

---

[1] This document and others were not originally authenticated when the parties filed their motions for summary judgment. However, the parties subsequently filed a Joint Stipulation on Authenticity of Exhibits (Doc. 97) in which they agreed to the authenticity of most of the exhibits.

the Quote then states, "We would need a purchase order before we can lock in a firm date." (*Id.*, p. 2).

The MAN Quote also includes certain "Terms and Conditions of Supply," which "shall be applicable to all … services performed by MAN." (*Id.*, p. 3). Significantly, the Quote states that, if there is a breach of warranty, MAN "shall, in complete fulfillment of its liabilities under this warranty, correct by repair or replacement any nonconformity which shall appear." (*Id.*). This remedy is given in lieu of all other warranties. (*Id.*). Further, the Quote provides that, in no event shall MAN be liable for any special, incidental, indirect, consequential, or punitive damages, including loss profits or revenue. (*Id.*).

According to a January 10, 2012, email sent from a BASF employee, the seals were not changed around the time of the November 7, 2011, Quote because they were only a year old and showed no signs of any issue with gas flow. (Doc. 78-11). However, the south seal "went squiffy" immediately after start up, reseated itself in about two weeks, and was "OK until a process upset on 12/21." (*Id.*). Another BASF employee responded, "Squiffy? I take it that's high flow or in alarm." (*Id.*).

On December 24, 2011, Kyle Frederick of BASF emailed others at BASF and said:

> C300 seal flow has increased and is holding at 18-22scfm. We had a plant upset that tripped the compressor and after restart it rose to this flow. We are hoping the flow will stabilize but if not we are asking for availability of a rep for dec 28 to assist with the change. Please check and let me know if one is free.

(Doc. 90-6).[2]

### B.  Email Exchanges Between December 25 – 27, 2011

On December 25, 2011, at 2:11 p.m., Kyle Frederick of BASF emailed Nick Granier of MAN asking, "Would you have a crew available to assist changing the seal on C300 Wednesday

---

[2] A more detailed discussion on how exigent the leak was is provided below.

28th? Can you give me a quote?"  (Doc. 86-3, p. 4).  Granier replied on December 26 at 7:18

p.m., "Yes, Looks like we will have several people available.  We will contact you first thing

tomorrow morning to discuss. … Sorry for the delay getting back to you." (*Id.*).  Frederick

responded minutes later at 7:35 p.m., "Thanks in advance for the help." (*Id.*).

On December 27, 2011, at 8:35 a.m., Jerad Mitchell of MAN sent an email to Kyle

Frederick of BASF stating:

> I have attached a copy of the quote that we generated for Leonard in November to
> perform this job.  This quote should be valid with the exception of the holiday that
> we have on Friday.  If this job should go into Friday our time will be billed
> according to our rate sheets for holiday pay.  Please work with Nick to get a P.O.
> for this opportunity.

(*Id.*, p. 1).

### C.  December 28, 2011 – The Day of Repairs and the P.O.

#### 1.  Arrival of the Crew

On December 28, at 6:14 a.m., Jerad Mitchell sent Kyle Frederick another email stating

in part:

> We have a crew heading out to you [sic] facility this morning per your request to
> begin a seal change out on C300.  It is possible that the P.O. is caught up due to
> the time frame we are working in to support this opportunity.  Can you please
> email Nick and I a confirmation P.O. which supports the efforts we a [sic] putting
> forth.  I forwarded the quote put together initially in November for this job as it
> should be the same pending holiday work on Friday.

(*Id.*, p.  3).

Both sides agree that MAN arrived at BASF's premises sometime before 7:00 a.m.   A

document entitled "MAN GATE PUNCHES BASF GEISMER 122811-123011" (Docs. 86-5 &

78-10) demonstrates that James Spinks and Kenneth Thompson are MAN employees that arrived

at the gates of the Geismar plant at 6:06 a.m.

## 2. BASF's Purchase Order

The parties agree that, at *some time* on December 28, BASF faxed *something* to MAN. But there is a dispute as to what was sent and when.

BASF contends that, at 8:50 a.m. Central Standard Time (or 15:50 Central European Time), BASF faxed to MAN a five-page Purchase Order containing certain terms and conditions for the job. BASF bases this on several pieces of evidence. First, BASF points to the testimony of Jamie Latuso, a BASF employee who buys maintenance and construction services for the Geismar site. (Deposition of Jamie Latuso, Doc. 86-6, p. 3). Latuso authenticated a screen shot of BASF's document system. (*Id.*). The screen shot reflects the transmission of the purchase order and says when the Purchase Order was sent, to whom it was sent, and whether the transmission was successful. (*Id.*, p. 3-4). The time is in European time, according to Latuso. (*Id.*, p. 5). Latuso created the P.O. and then sent it. (*Id.*, p. 5).

BASF also submits the screenshot itself, which states that the document was sent at 15:50. (Doc. 86-8). Further, the document states, "Successfully processed" and "Created by LATUSOJ."

BASF also submits the Affidavit of Scotty Owens. (Doc. 86-21). Owens was one of two "buyers of services" at BASF's Geismar facility in December 2011. (*Id.*, p. 1). The other was Jamie Latuso. (*Id.*). Owens attests that (1) 15:50 CET equates to 8:50 a.m. in Central Standard Time; (2) as the P.O. was created in BASF's system, the P.O. automatically included BASF's terms and conditions; (3) upon Latuso's saving of the P.O., the P.O. (including automatically all of BASF's terms and conditions) immediately dispatched from BASF and was faxed to MAN; and (4) the "successfully processed" notation means that "the purchase order - including the terms and conditions - was, in whole successfully transmitted to [MAN's] facsimile server." (*Id.*,

p. 4).  Owens further said that no one in the procurement department received an automated

notice error indicating any issue with the transmission of the P.O. and that no one at BASF

received a communication from MAN reporting an issue with transmitting the P.O. (*Id.*, p. 5).

MAN, on the other hand, submitted Nick Granier's affidavit of April 3, 2013, specifically

stating that the fax was transmitted by BASF at 3:55 p.m. (Doc. 78-8, p. 3).  But, in Granier's

deposition, taken on June 17, 2014, Granier said that he did not know what time zone the

"15:55" referred to and that he would have no reason to dispute the fact that the BASF purchase

orders were issued according to European time. (Doc. 78-9,  p. 17).[3]

Granier also attested to the fact that the P.O. was incomplete.  Grannier states that, while

the P.O. stated it was a five-page document, only two pages were transmitted, and those pages

did not contain BASF's terms and conditions. (Doc. 78-8, p. 3).

Regardless of whether the entire P.O. was transmitted, both sides agree that, at the very

least, the entire first page was transmitted. (Docs. 78-7, 86-9).  This page of the Purchase Order

provides:

> THIS ORDER IS SUBJECT TO THE TERMS AND CONDITIONS INCLUDED
> HEREWITH, AND SELLER AGREES TO BE BOUND THEREBY, BY
> SHIPPING THE GOODS, OR BY ACKNOWLEDGING RECEIPT OF THIS
> ORDER SELLER AGREES TO SUCH TERMS AND CONDITIONS.  ANY
> DIFFERENT OR ADDITIONAL TERMS IN SELLER'S ACCEPTANCE
> FORM, IF ANY, ARE HEREBY REJECTED.

(Docs. 78-7, 86-9).  Notably, the Purchase Order rejects terms in the seller's "*ACCEPTANCE

FORM*," not terms predating the P.O.  In any event, both copies of the P.O. contain the P.O.

/Release No. of 4901021764.

---

[3] Significantly, in MAN's Statement of Contested Fact, MAN does not point to the timing difference as an issue of
fact to preclude summary judgment for BASF, so MAN appears to concede that the affidavit was wrong and does
not create an issue of fact.

The full five-page P.O., submitted into evidence by BASF, provides important elements of the offer in the allegedly unsent pages. The third page lists the price as $45,000. (Doc. 86-19, p.3). This price differs from the $26,750.00 listed in the Quote. Additionally, on the fourth page, the Purchase Order expressly states that, if it is sent in response to a quote, then the terms of the Purchase Order supersede the terms of the quote and shall be a rejection of same. (*Id.*, p. 4). Finally, the fifth page provides that any cost or damage incurred by BASF as a result of a breach of a warranty shall be borne by MAN. (*Id.*, p. 5).

On December 28 at 9:02 a.m., Terry Bourgeois of BASF sent Jerad Mitchell of MAN the following e-mail:

Jerad,
Po for C-300 is as follows:
PO # 4901021764

(R.Doc. 86-3, p. 2). At 9:29 a.m., Mitchell then forwarded the email to Michael Yu and Leigh Brashier, both of whom are MAN employees, with the message, "P.O. for the job the guys are on today."

Nick Granier of MAN testified that he understood that the purchase order is "basically a contract number, as far as them [BASF] being bound to have to pay something against that number." (Doc. 78-9, p. 14)

Q: So you understand the purchase order is the contract?

A: Yes.

(*Id.*).

### 3. When Did Performance Begin?

The parties dispute when performance began. BASF cites to the deposition of James Spinks, MAN's supervisor for the job, wherein he said that he "could not start the work unless

[he] had a P.O." (Deposition of James Spinks, Doc. 86-11, p. 18). Spinks also said his approval "to start" was an e-mail that BASF sent to MAN. (*Id*.). Finally, Spinks testified that they "started work after 9:00" within thirty minutes of the work permit issuing.

Nick Granier also testified that the policy at the time of the contract was that MAN would do no work for BASF until BASF issued a purchase order: "Purchase order or, in emergency cases, we're told that e-mail or something like that is valid to proceed with going on a job." (Doc. 78-9, p. 28). Further, Granier testified that there was a "long history or a custom and practice" between MAN and BASF regarding the issuance of quotes, issuance of purchase orders and performance of the work, and "the procedure is, a quote is issued and BASF reviews the quote but no work can be done until BASF issues the purchase order[.]" (Doc. 78-9, p. 12).

Conversely, MAN contends and submits evidence showing that, while they did not start working *on the compressor* until around 9:00 a.m., MAN did *other work* after arriving at the plant around 6:00 a.m. Spinks testified that his work included reviewing drawings of the compressor with BASF and pointing out to BASF what had to be done on it. (Doc. 86-11, p. 51-52). Further, MAN performed the "lockout/tag-out" procedure to obtain a Safe Work Permit to begin work on the compressor. (*Id*.) The lockout/tag-out procedure requires them to a review of the lockout with operations personnel, and BASF has a designated spot for MAN to hang their lock. (*Id*., p. 31). This testimony confirms the Daily Report provided by MAN, which states that, on December 28, MAN "Arrived on site 7:00am, James Spinks, James Landry, Kenny Thompson, staged tooling, received permit, and performed lock out-tag out." (Doc. 90-8). Finally, Jerad Mitchell testified that MAN's workers are typically on the clock by the time the crew reaches the gate and that the customer would be charged by that point. The work is "already started" "by the time they get to the gate." (Doc 86-17, p. 51).

BASF responds with testimony from Spink's deposition:

Q: You said as far as the lockout and tagout was concerned, now you have to wait until you get a Safe Work Permit to actually go lockout and tagout, correct?

A: Yes, it's all done – it's one process together, yes.

(Doc. 86-11, p. 52). The BASF Safe Work Permit document states in the LOCKOUT/TAGOUT ISOLATION VERIFICATION section that the Date/Time was 12/28 at 9:00. (Doc. 86-10, p. 1). But this document does not say if that is the time the process was completed or began, or how long the process took.

### D. After Performance

Nicholas Granier attests that, by 3:55 p.m. on December 28, MAN had "performed substantial work on the seal replacement project for more than six hours." (Doc. 86-17, p. 51).

On December 30, the compressor failed. (Deposition of Mervin McCon, Doc. 80-6, p. 57). On the following day, MAN participated in disassembling and loading the compressor onto a truck for shipment to Houston for repairs. (*Id.*, 80-6, p. 15-16).

According to BASF's expert, BASF is claiming in damages $270,212.76 per day for 47 days (December 30, 2011 to February 16, 2012) for the shutdown of the turbo compressor after its failure. (See Doc. 90-3). This is about $12.7 million.

On February 3, 2012, MAN's President Peter Roth sent a letter to BASF in response to a BASF letter concerning the C-300 Compressor failure. (Doc, 86-14). The regarding line states: "RE: BASF Purchase Order No. 4901021764." (*Id.*) Also, in the letter, Roth states that MAN "did work for BASF at the Geismar facility under the above referenced Purchase Order and our Quote No. 11-11382 Rev. 1." (*Id.*). The letter also says that MAN remains "as always, willing to fulfill the obligations of the Purchase Order and the Terms and Conditions of Supply attached to our quotation and under which this Order was accepted." (*Id.*).

According to an invoice sent by MAN to BASF and dated March 16, 2012, MAN billed BASF $40,917.00 for "CHANGE SEALS ON EOT ONSITE WORK." (Doc. 86-15). The document contains a section stating "Your Reference," which says underneath "4901021764," which is the P.O. number. (*Id.*). There is no reference to the Quote number. (*Id.*).

Finally, in an email (Doc. 86-18) dated August 22, 2012, Jerad Mitchell of MAN appears to send the Quote to two other MAN employees. The Quote has a comment in the "Work Scope" section "for internal use only" stating:

> Unfortunately, This scope does not reflect what is required to change the seal as stated in the heading. The client possibly will argue that our guys enacted [sic] on this scope until Siemens representative arrive. I have no reason to question the credibility of the events explained by our crew. However, as the client I would challenge our competence due to this incorrect scope as an indication of what took place on site leading up to the OEM support arrival. Line item 7 is really misleading and was taken from the major overhaul scope when the seals were not changed. In actuality our crew new [sic] what was required and the quote was only a proposal.

(*Id.*).

## II.   <u>Summary Judgment Standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir.1994)

(citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir.1991).

## III. <u>Discussion</u>

### A. *MAN's Re-Urged Motion for Summary Judgment*

#### 1. The Parties' Arguments

MAN argues that (1) BASF expressly accepted MAN's Quote through emails, and (2) alternatively, BASF accepted by silence by allowing MAN to work for several hours in an emergency before sending the P.O.

BASF responds that (1) it did not expressly accept the Quote, and (2) there was no acceptance by silence.   BASF contends that (1) there was no silence because BASF sent the P.O. with differing terms; (2) there were no special circumstances because this was no emergency (e.g., no chemicals leaking or anything of the like); and (3) there should be no reasonable belief by MAN because, in the thirty-something prior transactions with BASF, BASF always sent a five-page P.O. containing an identical number of paragraphs for terms and conditions.

MAN further argues that BASF violated the warranty by not allowing MAN an opportunity to repair/replace the parts.  BASF responds that MAN had notice (through its employees and formal letter) that BASF was sending the parts to a facility in Houston for repairs. MAN replies that this still violated the terms of the contract and that BASF spoilated evidence.

## 2. Analysis

   *a.  Construing the evidence in a light most favorable to BASF, was Man's Quote an offer?*

MAN's motion for summary judgment is denied.  At the very least, reasonable minds could conclude that MAN's Quote was not an offer because the parties contemplated that a purchase order would issue.

"A party who demands performance of an obligation must prove the existence of the obligation." La. Civ. Code art. 1831.  Accordingly, a "party claiming the existence of a contract has the burden of proving that the contract was perfected between himself and his opponent." *Enter. Prop. Grocery, Inc. v. Selma, Inc.*, 38,747 (La.App. 2 Cir. 9/22/04), 882 So.2d 652, 655 (citing *Pennington Constr., Inc. v. R.A. Eagle Corp.*, 94-0575 (La.App. 1 Cir. 3/3/95), 652 So.2d 637).

"A contract is formed by the consent of the parties established through offer and acceptance."  La. Civ. Code art. 1927.  "Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent." *Id.*  Louisiana doctrine has explained:

> To constitute a true offer, a declaration of will must be sufficiently precise and complete so that the intended contract can be concluded by the offeree's expression of his own assent, thereby giving rise to that "mutual consent" of the parties which, in practical terms, is indistinguishable from the contract itself.

Saul Litvinoff, *Consent Revisited: Offer Acceptance Option Right of First Refusal and Contracts of Adhesion in the Revision of the Louisiana Law of Obligations*, 47 La. L.Rev. 699, 706 (1987).

"If there is a genuine dispute, it is left to the fact-finder to determine whether there has been a 'meeting of the minds' between the parties so as to constitute mutual consent."

*SnoWizard, Inc. v. Robinson*, 897 F.Supp.2d 472, 478 (E.D.La. 2012) (citation omitted).

"Moreover, '[t]he existence or nonexistence of a contract is a question of fact and, accordingly, the determination of the existence of a contract is a finding of fact.'" *Id.* (quoting *Sam Staub Enters., Inc. v. Chapital*, 2011-1050 (La.App. 4 Cir. 3/14/12), 88 So.3d 690, 694).

Here, applying these standards and construing the evidence in a light most favorable to BASF, reasonable minds could conclude that the Quote was not an offer.   Specifically:

- In his December 27, 2011, email attaching the Quote, MAN's Jerad Mitchell stated, "Please work with Nick to get a P.O. for this opportunity." (Doc. 86-3, p. 1).

- In his December 27 email at 6:14 a.m., Mitchell again stated, "It is possible that the P.O. is caught up due to the time frame we are working in to support this opportunity.  Can you please email Nick and I a confirmation P.O. which supports the efforts we a [sic] putting forth." (*Id.*, p. 3).

- The Quote states, "We would need a purchase order before we can lock in a firm date." (Doc. 86-12, p. 2).  Further, the Quote states, "Tooling required to perform *scope finalized by client and MAN*," implying that the scope needed to be finalized. (*Id.*, p. 1).

- In Jerad Mitchell's internal email (Doc. 86-18) dated August 22, 2012, he sent the Quote to two other MAN employees.  The Quote has a comment in the "Work Scope" section "for internal use only" stating:

  > **Unfortunately, This scope does not reflect what is required to change the seal as stated in the heading.**  The client possibly will argue that our guys enacted [sic] on this scope until Siemens representative arrive.  I have no reason to question the credibility of the events explained by our crew.  However, as the client I would challenge our competence due to this incorrect scope as an indication of what took place on site leading up to the OEM support arrival.  Line item 7 is really misleading and was taken from the major overhaul scope when the seals were not changed.  **In actuality our crew new [sic] what was required and the quote was only a proposal.**

  (emphasis added).

- Deposition testimony of MAN's employees suggests the Quote is not an offer.  James Spinks, MAN's supervisor for the job, testified that he "could not start the work unless [he] had a P.O."  (Doc. 86-11, p. 18).  Grannier, another MAN employee, also testified that the "purchase order is the contract." (Doc. 78-9, p. 14).

All of this evidence demonstrates that, construing the evidence in a light most favorable to BASF, the Quote was not "sufficiently precise and complete so that the intended contract can be concluded by the offeree's expression of his own assent." Thus, an issue of material fact precludes summary judgment in favor of MAN.

   b.   *Even if MAN's Quote were an offer, was there acceptance?*

This finding eliminates the necessity of addressing MAN's other arguments. However, the Court will do so in part.

The Court finds that a reasonable juror could find that, even if the Quote were an offer, BASF did not accept its terms expressly or by silence. BASF's December 25, 2011, email to Nick Granier of MAN asking, "Would you have a crew available to assist changing the seal on C300 Wednesday 28th? Can you give me a quote?" (Doc. 78-5) cannot reasonably be construed as an acceptance of the November 7 Quote. The email does not mention the Quote, and BASF specifically asks MAN to send him a quote, implying that he would like another quote. BASF's other email – "Thanks in advance for the help" – is also not an acceptance. This email was sent in response to Granier's December 26 email, which does not mention the Quote and only states that MAN has "several people available" and that MAN will contact BASF the following morning to discuss the project. In short, there is no express acceptance.

Further, a reasonable jury could conclude that there was no acceptance by silence. "When, because of special circumstances, the offeree's silence leads the offeror reasonably to believe that a contract has been formed, the offer is deemed accepted." La. Civ. Code. Art. 1942. Based on the plain text, there are three requirements to this article: (1) special circumstances, (2) silence by the offeree, and (3) reasonable belief by the offeror that a contract has been formed.

The parties argue as to whether there was emergency here which would qualify as "special circumstances" justifying acceptance by silence. Since reasonable minds could differ on this issue, summary judgment in favor of MAN is denied.

For MAN, Nicholas Granier testified that he considered this leak an emergency job for BASF Corp. (Doc. 86-7, p. 14). Jerad Mitchell also testified that he considered this an emergency:

> Q. And why do you call this an emergency?
>
> A. Do you work on Christmas? Christmas, the holiday work, and whenever we know in our industry what equipment is vital to the plant, and they tell us that, they -- typically an emergency is not something that says, Hey, give us a quote in two weeks and come out on the fifth week after we give you a P.O. That's not an emergency. An emergency is, Hey, I need somebody in two days. They don't have to state the word "emergency." You know in your industry when he says, I need somebody in two days. What can you do?
> …
> And when you call people off of vacation, right, and you say, Hey, I'll have to get people off. This guy's at the hunting camp. Hey, BASF, we're going to help you out. We're going to get some people out there. You have a TA coming. That's not a planned job. You know what I mean?

(Doc. 86-17, p. 16-17).

MAN also points to certain internal emails from BASF. In a November 8, 2011, email, BASF employee Thomas Bijtebier stated that the "high increase (in a short time) of the gas seal flow of the second seal [was] indeed disturbing," and he recommended that BASF "shutdown the machine and replace the seal (in order to prevent further damage)." (Doc. 90-4, p. 1-2). In a Nov. 11, 2011, email from Douglas Webster of BASF to others at BASF, Webster said that "The flow has reached the alarm point" and that BASF was "considering shutting the machine down for a seal replacement." (Doc. 90-5). Finally, in a January 10, 2012, email, a BASF employee said the seals "went squiffy," to which another BASF employee said, "Squiffy? I take it that's high flow or in alarm." (Doc. 78-11).

BASF, on the other hand, cites to BASF employee Kyle Frederic's deposition, who says that the compressor was still running on December 25, 2011. (Doc. 80-8, p. 8). Frederic said, "It wasn't an emergency for me. What I call urgent would be – where we're losing product to the atmosphere or, you know, somehow losing money. This was a decision to shut down in a controlled environment." (Doc. 80-8, p. 12). BASF further points to Jerad Mitchell's December 28, 2011, email stating that the Quote should be sufficient for the project "as it should be the same pending holiday work on Friday." (R.Doc. 78-5, p.3). The "holiday work" for New Year's Eve was the only way that this was out of the ordinary, BASF argues.

Based on this evidence, reasonable minds could differ as to whether there were "special circumstances" under La. Civ. Code art. 1942. On this ground alone, MAN's motion for summary judgment should be denied.

Reasonable minds could also differ on the issue of silence. This issue turns on when performance began, the two sides of which are discussed above. If performance began when MAN arrived at the plant at 6:00 a.m., then BASF was silent because the fax was not sent until 8:55 a.m. If performance began around 9:00-9:30 a.m. after work on the compressor began, then BASF was not silent. Since there is an issue of fact as to when performance began, there is an issue of fact as to whether there was silence. Accordingly, summary judgment for MAN should be denied on this ground as well.

In sum, a reasonable jury could find that MAN's Quote was not an offer. Even if it were an offer, a reasonable jury could conclude that there was no express acceptance, and there are issues of fact that preclude a determination of whether there was acceptance by silence.

*c. Warranty*

Because the Court finds that issues of fact preclude summary judgment on whether the Quote was an offer, the Court declines to address whether BASF breached MAN's warranty provision.

## B. BASF's Cross-Motion for Summary Judgment

### 1. The Parties' Arguments

BASF argues that MAN's Price Quotation was not an offer. According to BASF, an offer must conclude the bargain with acceptance alone, which the Quote did not do. BASF bases its argument on the terms of the Quote, MAN's statements and actions, and the parties' course of dealings. Further, BASF argues that, even if MAN's Quotation were an offer, BASF's P.O. was a counteroffer which MAN accepted by performance. Acceptance must be in conformity with an offer. Here, the P.O. had terms that were different from the quote. Further, according to BASF, the parties' course of dealing showed that MAN was aware of the full terms and conditions of the P.O. Finally, BASF argues that MAN's failure to complain or object to the P.O. as well as its post-performance conduct show that MAN accepted the P.O.

MAN contends that its Quote was in fact an offer and that the law prescribes no formalities for an offer. Further, MAN asserts that BASF's deteriorating turbo compressor created special, urgent circumstances to warrant acceptance by silence. MAN further says that it was working for hours before the P.O. was sent. Ultimately, the P.O. was a request for a modification that was not accepted by MAN. Finally, MAN says that their prior course of conduct shows that MAN frequently disputed BASF's terms and conditions.

## 2. Analysis

BASF's motion turns on how the Purchase Order is characterized.  It can be considered an offer, a counteroffer, or an attempt to modify a preexisting contract.   As will be explained below, the different options produce different outcomes.

### a.   For purposes of BASF's motion, was the Quote an offer?

The determination of how the Purchase Order is characterized turns on whether MAN's Quote is an offer.  This issue is critical.  If the Quote is not an offer, then BASF would be entitled to summary judgment because, even if MAN did not receive the entire Purchase Order, the parties had a valid contract from the partial Purchase Order or simply through an oral contract.[4]   In either event, the contract would be silent on the issue of damages and would be governed by La. Civ. Code art. 1995, which allows for the recovery of lost profits.[5]

As demonstrated above, there is considerable evidence that MAN's Quote was not an offer.  But the key issue here is whether, construing the documents and testimony in a light most favorable to MAN, there is evidence creating an issue of fact as to whether the MAN Quote is an offer and whether reasonable minds could differ as to that question.

Although the question is extremely close, the Court finds that there is - barely - sufficient evidence to create an issue of fact.  Specifically, emails exchanged between BASF and MAN from December 25 - 28, 2011, show, when construed in a light most favorable to MAN, that MAN intended the Quote to be an offer.  Jerad Mitchell stated in his December 27 email that

---

[4] If the Quote is not an offer and if the Purchase Order was sent before work commenced, then MAN clearly accepted the Purchase Order by commencing work. See La. Civ. Code. Art. 1939 ("When an offeror invites an offeree to accept by performance and, according to usage or the nature or the terms of the contract, it is contemplated that the performance will be completed if commenced, a contract is formed when the offeree begins the requested performance.").  If the Quote is not an offer and if the Purchase Order was sent after performance began, then BASF's initial request for MAN to perform repair work was an oral "offer," which MAN accepted by performance.  *See id.*

[5] La. Civ. Code 1995 provides, "Damages [for breach of contract] are measured by the loss sustained by the oblige and the profit of which he has been deprived."

"This quote should be valid with the exception of the holiday that we have on Friday." (Doc. 86-3).  When construing the facts in a light most favorable to MAN, Mitchell clearly intended for the Quote to govern the relationship between the parties and for the contract to be formed merely by BASF's consent.  While Mitchell requested a P.O. in the same email, this is arguably (again construing the facts in a light most favorable to MAN) merely a confirmation of payment.  Even though this evidence is weak, counsel for BASF conceded at oral argument that these emails created a genuine issue of fact as to whether MAN's Quote was an offer.  Accordingly, the Court finds that MAN's Quote could be an offer for purposes of BASF's motion.

> b.  *Results flowing from a finding that MAN's quote is an offer*

If MAN's Quote is an offer, then BASF's Purchase Order can be either a request to modify the contract formed by the Quote or a counteroffer.  This question turns on when performance began.[6]

The Court finds that the question of when performance began is a disputed issue of material fact.  The Court is guided by *Ever-Tite Roofing Corp. v. Green*, 83 So.2d 449 (La.App. 2 Cir. 1955).  There, homeowners executed a document to hire a contractor to re-roof their house.  *Id.* at 450.  The contract set forth the work that needed to be done and stated it would become binding "only upon written acceptance hereof … *or upon commencing performance of the work*." *Id.*  (italics in original).  The job needed to be performed on credit, so the contractor obtained credit reports and approval from a lender.  *Id.* at 451.  On the day immediately

---

[6] For purposes of BASF's motion, if the Quote was an offer, and if MAN began "performance" at 6:00 a.m. before the Purchase Order was sent, then there was already a valid contract in place between MAN and BASF based on the Quote.  Thus, the P.O. would be a request for a modification of the Quote.  If the Quote was an offer, and if MAN did not begin performance prior to the Purchase Order being sent (that is, MAN began performance between 9:00 – 9:30 a.m.), then the P.O. was a counteroffer to MAN's Quote, as the P.O. contained terms not in conformity with the Quote.  *See* La. Civ. Code. art. 1943 ("An acceptance not in accordance with the terms of the offer is deemed to be a counteroffer."); *LaSalle v. Cannata Corp.*, 2003-0954 (La.App. 1 Cir. 4/2/04), 878 So.2d 622, 624 ("A modification in the acceptance of an offer constitutes a new offer which must be accepted in order to become a binding contract.").

following approval, the contractor "engaged its workmen and two trucks, loaded the trucks with the necessary roofing materials and proceeded from Shreveport to [the homeowner's] residence" to perform the contract. *Id*. The contractor's workers discovered when they arrived that the homeowners had hired a third party whose workers were re-roofing the house. *Id*. The homeowners prevented the contractor from doing the work. *Id*. The contractor filed suit for breach of contract, and the trial court held that the homeowners gave adequate notice to withdraw from the contract. *Id*.

The appellate court reversed. *Id*. at 453. According to the Civil Code articles on timing of acceptance, a reasonable time to accept was required. *Id*. at 452 (citation omitted). The appellate court concluded:

> The contract was accepted by plaintiff by the commencement of the performance of the work contracted to be done. This commencement began with the loading of the trucks with the necessary materials in Shreveport and transporting such materials and the workmen to defendants' residence. Actual commencement or performance of the work therefore began before any notice of dissent by defendants was given plaintiff.

*Id*. Accordingly, the appellate court awarded damages in accordance with the contract, including lost profits. *Id*. at 453.

*Ever-Tite* is important, not because it definitely provides an answer to when performance begins, but because it shows, at the very least, reasonable minds could differ as to that question. Thus, for purposes of BASF's motion, there is a genuine issue of material fact as to when performance began, and there is, as a result, a question of whether the Purchase Order was a modification or a counteroffer. Phrased another way, for purposes of BASF's motion, the Purchase Order can be either a modification or a counteroffer, depending on what light is more favorable to MAN.

> ### c. If the Purchase Order was a modification, there is an issue of material fact precluding summary judgment.

The party asserting modification of an obligation must prove the facts or acts giving rise to the nullity, modification, or extinction. La.Civ.Code art. 1831; *Taita Chemical Co., Ltd. v. Westlake Styrene Corp.*, 246 F.3d 377, 387 (5th Cir. 2001) (denying summary judgment on the issue of modification, despite "a great amount of evidence favorable to" one party on the issue, because a genuine issue of material fact existed as to whether the other party agreed to the modification) (citations omitted). "Moreover, it is well established that even if the written contract contains a provision requiring that all modifications be in writing … either oral agreement or conduct can nonetheless prove modification." *Id.* (citations omitted). "In all instances, however, the party urging modification must establish that parties mutually consented to the agreement as modified." *Id*. (citations omitted). "[M]odification requires a meeting of the minds," so the issue is whether the other party "consented either expressly or impliedly to a modification." *Id.* (citations omitted).

Here, as in *Taita*, there is an issue of fact as to whether MAN consented to any modification. As demonstrated above, there is a "great amount of evidence favorable to" BASF from MAN's post-performance conduct that MAN was bound by the Purchase Order. However, in the February 3, 2012, letter (Doc. 86-14) from MAN's President Peter Roth to BASF, Roth states that MAN "did work for BASF at the Geismar facility under the above referenced Purchase Order *and our Quote No. 11-11382 Rev. 1*." (*Id*.) (italics added). The letter also states that MAN remains "as always, willing to fulfill the obligations of the Purchase Order *and the Terms and Conditions of Supply attached to our quotation and under which this Order was accepted.*" (*Id.*) (italics added). Thus, MAN clearly believed the terms of its Quote were binding. More importantly, the first page of the Purchase Order, which was undoubtedly

received, provided, "ANY DIFFERENT OR ADDITIONAL TERMS IN SELLER'S

ACCEPTANCE FORM, IF ANY, ARE HEREBY REJECTED." (Docs. 78-7, 86-9).  As stated

above, the Purchase Order rejects terms in MAN's "*ACCEPTANCE FORM*," *not* terms predating

the P.O. in the Quote. The language explicitly rejecting terms in a quote was included in the

allegedly missing pages of the Purchase Order, which, for purposes of BASF's motion, the Court

cannot consider.

Construing this evidence in a light most favorable to MAN, the Court finds that there is

sufficient evidence to create an issue of fact as to whether MAN consented to any proposed

modification of the contract formed by the Quote.  Accordingly, BASF's motion for summary

judgment must be denied.

Further, the Court need not address what results would be reached if BASF's Purchase

Order were a counteroffer.  While BASF cites to certain case law indicating that the Court

should consider the parties' prior history, MAN's failure to object, and the parties' post-

performance conduct, these cases are distinguishable.[7]  When considering BASF's motion, the

Court must construe the facts in a light most favorable to MAN, and, when the Court does so, the

Quote is an offer; performance began before the Purchase Order was sent; the Purchase Order is

thus a request for a modification of the existing contract governed by the Quote; the request was

---

[7] In short, *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115 (5th Cir. 1992), *superseded by statute on other grounds*, is an admiralty case in which the Fifth Circuit affirmed the district court's finding that Louisiana law did not apply under the Outer Continental Shelf Lands Act because the purchase order constituted a maritime contract. *Id.* at 1123-11124, 1126.  Most of the remaining cases did not involve a situation in which there were competing "contracts" – here, a Quote and a Purchase Order – that potentially govern the parties' relationship. While *Rectec, LLC v. Allied Erecting & Dismantling Co., Inc.*, No. 07-7126, 2008 WL 2067031 (E.D.La. May 14, 2008), involved a case with two potentially governing sets of documents (a Purchase Order on the one hand and emails on the other), that case is distinguishable in that one of the parties specifically rejected the emails as an offer and specifically stated that the project would be governed by the Purchase Order.  *Id.* at *5.  Further, the entire purchase order was sent in that case.  *Id.*  Here, construing the facts in a light most favorable to MAN, there is no such clarity from the two pages of the purchase order (which refers to an "Acceptance form," not to prior documents), and there is no explicit rejection of the Quote.

not accepted; and therefore the Quote, including its clause prohibiting the recovery of consequential damages, governs.  Accordingly, summary judgment for BASF is denied.

### d. Further case law on why summary judgment should be denied if there are two potentially governing contracts

The Court further notes that, if the Quote is an offer, there is an additional reason for denying summary judgment.  Jurisprudence, including Fifth Circuit cases and a case cited with approval by the Fifth Circuit, recognizes that summary judgment is not appropriate when there is clearly a contract governing the parties but there is an issue of fact as to the parties' intent and as to which of two documents control the parties' relationship.

First, in *Jefferson Parish School Board v. Rowley Co.*, *Inc.*, 305 So.2d 658, 663 (La.App. 4 Cir. 1975), the appellate court reversed the trial court's granting of a summary judgment because there was a material issue of fact as to the validity of a contract.  A school board publicly advertised a bid for furnishing and installing science equipment to be used in particular science laboratory classrooms. *Id.* at 660.  The contractor submitted a bid that was accepted.  *Id.* "Although the contract documents furnished included a formal contract proposed to be signed, no contract was signed." *Id.* at 661.  Rather, the school board issued a purchase order to the contractor containing certain instructions. *Id.*  The contractor thereafter delivered the equipment and was in the process of installing it. *Id.*  The contractor later delivered an invoice to the school board as its first request for payment. *Id.* Two days later, a fire broke out, and some of the equipment was damaged and destroyed. *Id.*  The trial court sided with the contractor, holding that the contract between the contractor and school board was a contract of sale, so the title to the property passed to the school board upon delivery.  *Id.* (citing La. Civ. Code art. 2456).

The appellate court rejected this approach, explaining that the controlling issue was not whether the contract was a construction contract or contract of sale. *Id.*  Rather, the "controlling

issue is that, whatever it may be called, if there was a binding contract between the parties, did that contract provide for risk of loss in the factual circumstances here?" *Id.*

The appellate court found that there was "a serious issue of contested fact herein" so summary judgment was inappropriate." *Id.* The school board argued that the contractor's bid controlled, which required the contractor to obtain insurance to cover the equipment, whereas the contractor argued that, based on certain factors (past dealings, the lack of any formal contract, and the lack of a performance bond), the contract in effect was the school board's purchase order, which did not include the terms of any other contract. *Id.* at 662. The Fourth Circuit then said "it is first necessary to resolve the question of the validity of the contract containing [the provisions regarding insurance coverage]" before examining the general law governing contracts. *Id.* at 663. The court concluded:

> The resolution of this question involves a consideration of the weight and sufficiency of the testimony of the parties as well as the disputed documents. This is not the province of motion for summary judgment but is a matter for consideration on the merits. Motion for summary judgment should not be used as a substitute for a trial on the merits. This is especially true where opinion or intent are involved. Summary judgment being improperly granted, we must remand for further proceedings.

*Id.* (citations omitted).

*Jefferson* is directly on point. There are a few differences,[8] but they are distinctions without a difference. Accordingly, summary judgment in this case is inappropriate.

*Jefferson* is particularly convincing authority because it was recently relied upon by the United States Fifth Circuit in *Trahan v. Scott Equipment Co., L.L.C.*, 493 Fed.Appx. 571, 2012

---

[8] In *Jefferson,* each party was trying to enforce the other party's contract while, in this case, each party is trying to enforce its own contract. In *Jefferson*, there is no language in the contract documents rejecting conflicting terms and conditions, but that too is irrelevant here. When construed in a light most favorable to MAN, the first two pages of BASF's P.O. did not reject all non-conflicting terms The P.O. said, "ANY DIFFERENT OR ADDITIONAL TERMS *IN SELLER'S ACCEPTANCE FORM,* IF ANY, ARE HEREBY REJECTED." (Docs. 78-7, 86-9). As stated above, the conflicting terms were in a preceding quote, not an acceptance form sent after the fact. Finally, MAN argues that BASF's purchase order was sent after work began, but BASF presents some testimony contradicting this and thus creating an issue of fact that makes summary judgment even more inappropriate.

WL 4841949 (5th Cir. 2012).  In *Trahan*, the operator of a salt mine filed suit against its equipment service contractor for breach of contract. *Id.* at 572.  From 2000 to 2005, the parties' relationship was governed by a Master Service Agreement ("MSA") executed each year with identical terms and conditions.  *Id.*  In 2005, the operator stopped using MSAs and started issuing purchase orders for the desired work and providing for each service call an "individual service contract," the terms and conditions of which were substantially similar to those in the earlier MSAs. *Id.*  Because of the nature of the work, the operator's practice was to send the individual service contract to the contractor after each job was completed. *Id.*  While the service contract required the contractor to sign and return the contract to the operator, the contractor never did so, and the operator never complained about this failure. *Id.*

This arrangement continued without question until December 2008, when one of the contractor's employees was injured on a service call. *Id.* at 572-73.  The worker filed suit against the operator, and the operator filed a third-party claim against the contractor based on provisions in the service contract in which the contractor allegedly agreed to add the operator as an additional insured. *Id.* at 573.

The parties filed cross-motions for summary judgment.  *Id.*  The district court granted the contractor's motion on the basis that the parties' "course of dealings did not bind [the contractor] to contract provisions in the service contracts that were unsigned and consistently sent to [the contractor] after the work had been performed." *Id.*  In sum, the district court found no contract binding between the parties.

On appeal, the operator argued that the service contract's terms and conditions supplemented the oral contract in which the operator engaged the contractor to perform maintenance on salt mine equipment. *Id.*  The operator argued that the contractor never objected

to hundreds of such service contracts. *Id.* at 574. The contractor, on the other hand, argued that

there was no evidence that the contractor ever affirmatively agreed to the terms in the service

contract and that it never signed and returned a copy. *Id.*

The Fifth Circuit rejected the contractor's argument that there was no valid contract. The

appellate court explained:

> The district court is correct that no written contract is created in such a situation.
> A party may not supply a written contract after the contract has been performed
> and then claim that the parties are bound by its terms. However, when an
> enforceable oral contract is perfected between the parties, but they disagree on its
> terms, writings between the parties may be relevant in discerning the terms of the
> oral contract.
>
> Though Scott [the contractor] adamantly denies the existence of any contract
> whatsoever, its position is untenable. In Louisiana, "A contract is formed by the
> consent of the parties established through offer and acceptance." La. Civ.Code art.
> 1927. Moreover, "offer and acceptance may be made orally, in writing, or by
> action or inaction that under the circumstances is clearly indicative of consent."
> *Id.* "A medium or a manner of acceptance is reasonable if it is the one used in
> making the offer or one customary in similar transactions at the time and place the
> offer is received." *Id.* art.1936. "When an offeror invites an offeree to accept by
> performance and, according to usage or the nature or the terms of the contract, it
> is contemplated that the performance will be completed if commenced, a contract
> is formed when the offeree begins the requested performance." *Id.* art.1939.
>
> Under these principles, the record in this case clearly establishes the existence of a
> contract. Morton [the operator] issued a service request to Scott [the contractor];
> Scott complied and completed the requested service in exchange for monetary
> compensation, which Morton paid. A contract was thus formed.

*Id.* at 574. The Court then rejected summary judgment in favor of either party:

> Though we can be sure of the existence of a contract, its terms are uncertain.
> "Louisiana Civil Code article 2045 defines interpretation of a contract as 'the
> determination of the common intent of the parties.' " *Odyssea Vessels, Inc., v. A
> & B Indus. of Morgan City, Inc*., 94 So.3d 182, 190 (La.Ct.App. 1st Cir.2012).
> When the words and provisions of a contract are clear, "no further interpretation
> may be made in search of the parties' intent." LA. CIV.CODE art. 2046.
> However, "A doubtful provision must be interpreted in light of the nature of the
> contract, equity, usages, the conduct of the parties before and after the formation
> of the contract, and of other contracts of a like nature between the same parties."
> *Id*. art.2053. **Louisiana courts have not hesitated to consider evidence of past**

> dealings between parties when attempting to reconstruct the parties' mutual intent. *See, e.g., Rogers v. Restructure Petroleum Mktg. Servs.*, 811 So.2d 1154, 1159 (La.Ct.App. 3d Cir.2002); *Charles v. Wiegand*, 401 So.2d 1003, 1005 (La.Ct.App. 4th Cir.1981). However, this inquiry is inevitably a question of fact not appropriate for summary judgment. *Kemp v. Hudnall*, 423 So.2d 1260, 1261 (La.Ct.App. 1st Cir.1982) ("Our Supreme Court [has] stated ... that the terms of a particular contract are a question of fact." (*citing Turregano v. Barnett*, 127 La. 620, 53 So. 884 (1910))); *see Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 461 (5th Cir.1995). In its role as factfinder, a trial court is free to give appropriate weight to evidence that a party impliedly assented to terms by not objecting over a period of years, or to any other relevant facts.

*Id.* at 574-75 (emphasis added). The *Trahan* court then noted that *Jefferson* was "[p]articularly instructive." *Id.* at 575. After providing a summary of *Jefferson*, the Fifth Circuit concluded, "The same principles apply to this case. Questions of fact have been presented regarding the terms of the contract the parties agreed to be bound by. These issues of fact must be presented to a factfinder on remand." *Id.*

Trahan not only shows the importance and persuasiveness of *Jefferson*, but it is also convincing authority. As in *Trahan*, there is no dispute here that there was a valid contract binding the parties, either through the Quote, the Purchase Order, or an oral contract. But, as in *Trahan*, there is a dispute as to what the parties intended in that contract. While *Trahan* shows that BASF is correct that past dealings and the failure to object are relevant in determining the parties' intent, those factors do not mean that summary judgment is warranted when there are disputed issues of material fact as to intent. Just as summary judgement was improper in *Trahan*, so is it inappropriate here.

Finally, the court will also follow *Brimstone Industries, Inc. v. Occidental Chemical Corp.*, 37 F.3d 633, 1994 WL 558957 (5th Cir. 1994) (unpublished).[9] There, the Fifth Circuit

---

[9] While *Brimstone* states that it has no precedential value and is thus unpublished, the current 5th Cir.R. 47.5.2 provides that unpublished opinions issued before January 1, 1996 are binding precedent. Even if it were not binding, however, this Court would follow the decision as it is highly persuasive.

vacated the district court's granting of a motion for summary judgment. *Id.* at *4. The defendant Occidental solicited bids for a project, and the plaintiff Brimstone's vice president submitted a written proposal. *Id.* at *1. According to the vice president, Occidental's purchasing agent verbally authorized Brimstone to begin work on the project. *Id.* Brimstone claimed that the work began shortly thereafter, but Occidental claimed that work started later, after the delivery of a purchase order by Occidental. *Id.* at *1 and *1 n. 2. The purchase order provided an estimated cost of work and required Brimstone to obtain approval for work over the estimated cost. *Id.* at *1. Brimstone then submitted an invoice for well over the estimated cost. *Id.* Occidental paid the estimated cost but not the total value of the invoice, and Brimstone filed suit. *Id.* The district court granted summary judgment for Occidental. *Id.*

The Fifth Circuit reversed, explaining that the "real merits issue is whether a valid contract was formed based on Brimstone's Proposal or whether it was formed based on Occidental's Purchase Order." *Id.* at *4. Brimstone argued that its proposal to Occidental was an offer which Occidental's agent verbally accepted and that Brimstone subsequently began performance before Occidental's purchase order was received. *Id.* Occidental argued that its Purchase Order was not in conformity with Brimstone's offer and was thus a counteroffer, which Brimstone accepted, thereby creating a binding contract. *Id.* Brimstone responded by arguing that there was already a contract in place before the Purchase Order was received. *Id.* In reversing, the Fifth Circuit noted that there were certain materially unanswered questions of fact, including the date that Brimstone commenced work and the date on which the Purchase Order was received. *Id.* Accordingly, summary judgment for Occidental was denied given these genuine issues of material fact.

*Brimstone* is remarkably similar. As in *Brimstone*, there is a dispute involving conflicting "offers" (in both cases, a bid and a purchase order), and that dispute turns in part on when performance began. The parties raise the same arguments in *Brimstone* as they do here. If summary judgment was not warranted in *Brimstone*, then it should not be granted here.

In sum, if the Quote is an offer, then the Court is left with two potentially valid "offers." Fifth Circuit precedent clearly demonstrates that such a situation involves genuine issues of material fact that make summary judgment inappropriate. On this additional basis, summary judgment for BASF is denied.

## IV.    Conclusion

Accordingly,

**IT IS ORDERED** that the Reurged Motion for Summary Judgment (Doc. 78) filed by Man Diesel & Turbo North America, Inc. is **DENIED**, and

**IT IS FURTHER ORDERED** that the Cross-Motion for Summary Judgment (Doc. 86) filed by BASF Corporation is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>May 15, 2015</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**